**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CHANA WILEY, as Personal | : | |
| Representative for Jaron Ben-Rasu Thomas | : | |
| and Administratrix of his Estate, | : | |
| c/o Walton + Brown, LLP. | : | |
| 395 E. Broad St. Suite 200 | : | |
| Columbus, Ohio 43215, | : | |
| | : | Civil Action No. |
| and | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| CITY OF COLUMBUS, OHIO, | : | |
| c/o City Attorney | : | |
| 77 N. Front St. | : | |
| Columbus, OH 43215, | : | JUDGE |
| | : | |
| and | : | MAGISTRATE JUDGE |
| | : | |
| DARREN STEPHENS, in both his | : | |
| individual and official capacities, | : | |
| c/o City of Columbus, Division of Police | : | |
| 120 Marconi Blvd. | : | |
| Columbus, OH 43215, | : | |
| | : | |
| and | : | |
| | : | |
| CHASE PINKERMAN, in both his | : | |
| individual and official capacities, | : | |
| c/o City of Columbus, Division of Police | : | |
| 120 Marconi Blvd. | : | |
| Columbus, OH 43215, | : | |
| | : | |
| and | : | |
| | : | |
| MICHAEL ALEXANDER, in both his | : | |
| individual and official capacities, | : | |
| City of Columbus, Division of Police | : | |
| 120 Marconi Blvd. | : | |

1

Columbus, OH 43215,       :
                              :
     and                   :
                              :

JOHN OR MARY DOE, in both his or her  :
individual and official capacities,    :
City of Columbus, Division of Police   :
120 Marconi Blvd.              :
Columbus, OH 43215,       :
                              :    **JURY DEMAND ENDORSED HEREON**
           Defendants.    :

## I.    <u>Preliminary Statement</u>

1.    In bringing civil rights, wrongful death, survivor, and loss of consortium claims, Plaintiff seeks declaratory, injunctive, and monetary relief for the violations of the Fourth Amendment right of Jaron Ben-Rasu Thomas to be free from excessive use of force and his common-law right to be free from reckless conduct directly and proximately causing his pain, emotional distress, and death when, on January 14, 2017, Defendant Police Officers and City employees, who were inadequately trained and supervised by Defendant City of Columbus, Ohio in handling individuals suffering from a mental health crisis and/or excited delirium syndrome, responded to his 911 call for emergency assistance due to his ingestion of cocaine and hallucinations and, in response to him rolling around and contorting his body, decided to handcuff him and punch, body slam, knee, choke-hold, and hobble strap him into submission which caused him to lose consciousness and subsequently caused his death nine days later.

## II.    <u>Jurisdiction</u>

2.    This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

3.    Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202 and 42 U.S.C. § 1983.

4.     Compensatory and, against Defendant Police Officers and City employees, punitive damages may be awarded under 42 U.S.C. § 1983 and the common law of the State of Ohio.

5.     Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. § 1988; Fed. R. Civ. P. 54; and the common law of the State of Ohio.

6.     Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the events or omissions giving rise to the claims occurred in Franklin County, Ohio.

**III.    <u>Parties</u>**

7.     Plaintiff Chana Wiley is both the personal representative appointed by the Franklin County Probate Court for Jaron Ben-Rasu Thomas, bringing a survival action on his behalf, and the administratix of his estate, bringing this action for the benefit of his next-of-kin and heirs.

8.     Defendant City of Columbus, Ohio is a political subdivision of the State of Ohio pursuant to Chapter 2744, Ohio Revised Code, and, at all times material to this action, employed Defendant Police Officers at its Department of Public Safety in its Division of Police; established the municipal policies governing their conduct as police officers; mandated their training in those policies; supervised their conduct to ensure it was consistent with those policies and their training; and was a "person" under 42 U.S.C. §1983 and acted under color of law.

9.     Defendant Darren Stephens, who is being sued in both his individual and official capacities, is a Police Officer employed by Defendant City of Columbus, Ohio; was, at all times material to this action, a "person" under 42 U.S.C. §1983 and acted under color of law; was taller and heavier than Mr. Thomas; and is Caucasian.

10.    Defendant Chase Pinkerman, who is being sued in both his individual and official capacities, is a Police Officer employed by Defendant City of Columbus, Ohio; was, at all times

material to this action, a "person" under 42 U.S.C. §1983 and acted under color of law; was taller and heavier than Mr. Thomas; and is Caucasian.

11.     Defendant Michael Alexander, who is being sued in both his individual and official capacities, is a Police Officer employed by Defendant City of Columbus, Ohio; was, at all times material to this action, a "person" under 42 U.S.C. §1983 and acted under color of law; was taller and heavier than Mr. Thomas; and is Caucasian.

12.     Defendants John or Mary Doe are police officers, 9-1-1 operators, dispatchers, and others whose identity is not currently known; is being sued in both his or her individual and official capacities, is an employee of the Defendant City of Columbus, Ohio; was, at all times material to this action, a 'person' under 42 U.S.C. §1983 and acted under color of law.

## IV.    <u>Facts</u>

13.     Jaron Ben-Rasu Thomas died at the age of 36 years old, leaving behind three minor children -- Alina Roberts, Katherine Thomas, and Kai Thomas – and a host of extended family and friends throughout Columbus, Ohio.

14.     Mr. Thomas attended Eastmoor High School, was a member of Mt. Vernon African Methodist Episcopal Church, and at all times material to this action, was a resident of Columbus.

15.     Mr. Thomas was a gifted hip-hop lyricist, a partner in 7th Sign Regime Record Label, and had worked closely with renown rapper Bizzy Bone (Bryon Anthony McCane II) during his time with 7th Sign Regime.

16.     Mr. Thomas had been diagnosed with and was being treated with prescription medications and counseled for schizophrenia, manifest by hallucinations he experienced, and he was also battling abuse of cocaine.

17.    On January 14, 2017, Mr. Thomas, an African-American, was 5'9" in height and approximately 195 pounds in weight.

18.    Near midnight on Saturday, January 14, 2017, Mr. Thomas called 911 to seek emergency assistance.

19.    Mr. Thomas had been told by mental health professionals treating or counseling him about his schizophrenia to dial 911 for emergency assistance whenever he needed it.

20.    Before January 14, 2017, Mr. Thomas had called 911 for emergency assistance and received it without incident, including on December 3, 2015, when police officers transported him to Netcare, a mental health and substance abuse intervention center, because he was not feeling well and hearing voices.

21.    On January 14, 2017, in a calm and polite voice Mr. Thomas explained to the 911 operator, "I keep hearing these voices," admitted that he had recently used cocaine and his heart was pounding, and said he needed an ambulance and would never use cocaine again.

22.    In his conversation with the 911 operator, Mr. Thomas said, "I feel like I'm going to get shot.  And I'm really paranoid because I was high.  And it feels like I'm going to die or something."

23.    When questioned by the 911 operator, he stated that he felt like he was overdosing, that something was going to happen, that it was scaring him, and that his heart was pounding.

24.    When connected to a dispatcher, he relayed that he felt like he was going to be shot, that he was really paranoid, and that he felt like he was going to have a heart attack. He follows these statements by saying "I love you" to someone.

25.     When Mr. Thomas apparently believed the call had been disconnected, he proceeded to speak to himself and/or someone else in the background, believed to be his brother, Josiah Thomas. In the conversation, which lasted approximately two minutes, he calmly apologized and reiterated that he will never do cocaine again. He informed Josiah that he would head outside for a few. He explained to Josiah that it was "real scary right now" because it felt like when he called they were not listening to him. The call included a prolonged period of silence before concluding.

26.     The 911 operator sent police officers to a residence at 3271 Medina Avenue in Columbus.

27.     The 911 operator communicated to the police officers sent to that residence the gist of Mr. Thomas' call, including his hallucinations, recent use of cocaine, paranoia, and that he thought that he might be overdosing.

28.     Several police officers, ultimately resulting in approximately a dozen officers, responded.

29.     When the first police officer, Defendant Police Officer Pinkerman, arrived, he reported hearing "numerous loud noises against the walls and screaming that appeared to be the sounds of a struggle."

30.     Defendant Police Officer Pinkerman also reported hearing "what sounded like at least one individual falling down from the second story of the residence and continue falling down a set of stairs."

31.     Defendant Police Officer Pinkerman reported that Mr. Thomas then opened the residence door, ran outside, and fell down into the front yard.

32.     Defendant Police Officer Pinkerman reported that he gave "loud verbal commands" for Mr. Thomas to cease running and to remain on the ground; however, Mr. Thomas continued running toward Medina Ave until he fell down in the front yard again.

33.     Defendant Police Officer Pinkerman reported that Mr. Thomas then began "violently rolling around and sporadically contorting his body."

34.     Defendant Police Officer Pinkerman reported that Mr. Thomas continued rolling, got up again, and ran to the middle of the street.

35.     Defendant Police Officer Pinkerman reported that he then placed Mr. Thomas on the ground and loudly commanded him to put his arms behind his back.

36.     Defendant Police Officer Pinkerman reported that Mr. Thomas again did not comply; however, he was able to place a handcuff on his left wrist.

37.     Defendant Police Officer Stephens then arrived on the scene and reported that, as he approached, he had observed Defendant Police Officer Pinkerman struggling with Mr. Thomas in the middle of the road on Medina Ave.

38.     Defendant Police Officer Stephens reported that he observed Defendant Officer Pinkerman giving Mr. Thomas loud verbal commands to place his hands behind his back. As he ran up to Mr. Thomas, he saw that Defendant Police Officer Pinkerman had Mr. Thomas' left hand handcuffed.

39.     Defendant Police Officer Stephens reported that Mr. Thomas was aggressively attempting to pull his left arm/wrist away from Defendant Police Officer Pinkerman and that he grasped hold of Mr. Thomas' right wrist to place his right arm/wrist behind his back.

40.     Defendant Police Officers reported that Mr. Thomas was moving his hand around underneath his body as if he was reaching or attempting to find something.

41. Defendant Police Officers reported that after giving loud, verbal commands to Mr. Thomas to pull his hand out from under his person, and in fear that Mr. Thomas was trying to reach a weapon, Officer Stephens struck Mr. Thomas with a closed fist to the right side of his face.

42. Defendant Police Officers further reported that, when Mr. Thomas continued to disobey the orders to present his wrist to be handcuffed and resisted, Officer Stephens struck him a second time with a closed fist to the right side of his face.

43. Both Defendant Police Officers Pinkerman and Stephens were bent down wrestling with Mr. Thomas, when Officer Stephens then placed his left knee on Mr. Thomas' right shoulder.

44. Defendant Police Officer Pinkerman then delivered a right-knee strike to Mr. Thomas' right side, which allowed Defendant Police Officer Stephens to remove Mr. Thomas' right arm from under his body.

45. Defendant Police Officer Michael Alexander then arrived on the scene and assisted Officers Stephens and Pinkerman in handcuffing Mr. Thomas.

46. Defendant Police Officers reported that, while handcuffed and held by two officers, Mr. Thomas became combative, they placed him on the ground, and Officer Michael Alexander secured a hobble strap, which they placed on Mr. Thomas.

47. The hobble strap bound Mr. Thomas's feet together and was attached to his handcuffs.

48. There were no residents or neighbors nearby or within harm's way of Mr. Thomas while he was convulsing and behaving in the manner in which the officers described.

49. Mr. Thomas was unarmed.

50.     Defendant Police Officers had no reason to suspect that Mr. Thomas was armed and concocted a fear that he was armed and might be reaching for a weapon while his right arm was pinned underneath his body.

51.     Mr. Thomas lacked access to anything that could be used as a weapon and was completely restrained by Defendant Police Officers.

52.     Defendant Police Officers knew that Mr. Thomas lacked access to anything that could be used as a weapon.

53.     The police officers who responded were not in any danger of serious bodily harm or injury from Mr. Thomas.

54.     Defendant Police Officers knew that they were not in any danger of serious bodily harm or injury from Mr. Thomas.

55.     Mr. Thomas had not destroyed any property on the evening of January 14, 2017.

56.     Defendant Police Offices were unaware of any property destruction committed by Mr. Thomas.

57.     Mr. Thomas had called 911 from the location he was visiting, accurately gave the address of that residence, and posed no significant risk of flight from Defendant Police Officers.

58.     Defendant Police Officers knew that Mr. Thomas had called 911 from the location he was visiting, accurately gave the address of that residence, and posed no significant risk of flight from them.

59.     Defendant Police Officers responded to Mr. Thomas' 911 call without planning to arrest him for possession and/or use of cocaine.

60.     Mr. Thomas was never charged with possession and/or use of cocaine.

61. Defendant Police Officers did not consider Mr. Thomas a criminal suspect when they responded to his 911 call.

62. In responding to Mr. Thomas' 911 call, Defendant Police Officers considered him an individual who may have accidentally harmed himself by ingesting cocaine and intended to provide emergency assistance rather than enforce criminal laws on possession and/or use of cocaine.

63. Rather than recognize that Mr. Thomas was suffering excited delirium syndrome and in dire need of emergency medical care, Defendant Officer Pinkerman shouted at him to put his hands behind his back to be handcuffed and Defendant Officer Stephens shouted that same order.

64. This police response aggravated Mr. Thomas' symptoms of cocaine use and schizophrenia, and he was unable to comply as quickly as surrounding police officers wanted him to.

65. Mr. Thomas was passively noncompliant and, contrary to the report by Defendant Police Officers Pinkerman and Stephens, did not actively resist the order to put his hands behind his back.

66. Without warning and contrary to the report by Defendant Police Officers Pinkerman and Stephens, they immediately pummeled Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him, and kneeing him on his right side and shoulder, until he was handcuffed and then applied a hobble strap to him.

67. A few moments later, Mr. Thomas lost consciousness.

68. Paramedics, who were called by Defendant Police Officers after they pummeled Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him,

and kneeing him on his right side and shoulder, until he was handcuffed and then applied an hobble strap to him, administered Narcan, but Mr. Thomas' heart stopped in the ambulance on the way to the hospital.

69. Chest compressions got Mr. Thomas's heart going.

70. On January 23, 2017, surrounded by his family, Mr. Thomas died after nine days of treatment in the OhioHealth Riverside Methodist Hospital.

71. When he arrived at the Hospital, Mr. Thomas was suffering from severe brain damage, head and body contusions, a blood clot near his sternum, a fracture of his right humeral head, several broken ribs, and other injuries.

72. Mr. Thomas's ingestion of cocaine did not kill him.

73. The Franklin County Ohio Coroner's Report designated the cause of Mr. Thomas' death to be anoxic encephalopathy as a consequence of cardiac arrest as a consequence of cocaine induced delirium, characterized that death as an accident, and attributed his injury to cocaine toxicity with features of excited delirium.

74. The autopsy conducted by the Franklin County Ohio Coroner's Office occurred on January 24, 2017.

75. In its Findings and Diagnoses, the Franklin County Ohio Coroner's Report listed under cocaine induced delirium: the presence of cocaine metabolites in Mr. Thomas' blood; reported auditory hallucinations; reported multiple falls; reported physical altercation with law enforcement; and reported cardiac arrest within ambulance.

76. In its Findings and Diagnoses, the Franklin County Ohio Coroner's Report listed as recent blunt force injuries of the head: several scabs on the left side of the forehead; aged periorbital ecchymosis of the right eye; and two dried subgaleal hemorrhages on the right side.

77.     In its Findings and Diagnoses, the Franklin County Ohio Coroner's Report listed as recent blunt force injuries of torso: bilateral aged ecchymoses of the torso; right-sided rib fractures – ribs 8-10; and CT documented right 12th rib fracture.

78.     In its Findings and Diagnoses, the Franklin County Ohio Coroner's Report also listed scattered aged ecchymoses and scabs of the upper extremities; aged ecchymoses and scabs of the right and left knees; cerebral edema; myocardial bridging of the proximal segment of the left anterior descending coronary artery; pulmonary edema, congestion, and atelectasis.

79.     The Narcan administered by the paramedics was a nasal spray that is the only FDA-approved nasal form of naloxone for emergency treatment of known or suspected opioid overdose.

80.     Narcan is an effective drug that reverses opioid overdoses.

81.     Cocaine is a stimulant which is widely being used in combination with opioids.

82.     Prior to January 14, 2017, Defendants knew that cocaine was a stimulant widely used in combination with opioids.

83.     Studies involving thousands of patients and over decades have demonstrated the efficacy of Narcan and its primary ingredient, naloxone.

84.     Paramedics operating in the City of Columbus rely on Narcan to reverse opioid overdoses.

85.     Paramedics operating in the City of Columbus use Narcan when presented with an individual who has ingested cocaine.

86.     The experience of Paramedics operating in the City of Columbus is that Narcan has been effective in reversing opioid overdoses and mitigating adverse effects from cocaine ingestion.

87.     Based on the timeline beginning approximately 30 minutes before Mr. Thomas' 911 call and proceeding through when Narcan was administered to him, the Narcan would effectively have mitigated the adverse effects of his cocaine use.

88.     The paramedics who administered the Narcan to Mr. Thomas followed the instructions provided in administering Narcan and did so properly.

89.     The Narcan administered by the paramedics to Mr. Thomas had been safely stored, its tamper-proof wrapping had been undisturbed, and there was no reason to suspect that it had been diluted, misbranded, or was otherwise different from other Narcan sprays.

90.     Mr. Thomas died due to excited delirium syndrome which, in response to the use of excessive force by police officers, pumped so much adrenalin into his body that it functioned as the equivalent of a heart attack or respiratory failure.

91.     Excited delirium syndrome is often associated with use of drugs and schizophrenia.

92.     Individuals suffering from excited delirium syndrome typically exhibit bizarre behavior, hyperactivity, and confusion.

93.     The use of cocaine causes the heart to beat faster, impairs breathing, and decreases the body's production of oxygen.

94.     The use of excessive force aggravates excited delirium syndrome by further decreasing the body's production of oxygen.

95.     Individuals suffering from excited delirium syndrome become so overwrought from the use of excessive force that their body overdoses them with adrenalin.

96.     While some excessive force may not be fatal to an average person, an individual suffering from excited delirium syndrome is vulnerable to death from such force.

97. Defendant City of Columbus, Ohio knew, before January 14, 2017, that its police officers regularly dealt with individuals who had abused drugs and were under the influence when the officers dealt with them.

98. Defendant City of Columbus, Ohio knew, before January 14, 2017, that individuals who had abused drugs with whom its police officers regularly dealt while the individuals were under the influence often had severe mental health problems.

99. Defendant City of Columbus, Ohio created a Crisis Intervention Team to deal with mentally ill individuals.

100. Defendant City of Columbus, Ohio explained in its Crisis Intervention Team and Guidelines for Dealing with Mentally Ill Individuals that the characteristics of potential mental illness include unusual or bizarre behavior, confused or nonsensical verbal communication, hostility toward and distrust of others; unreasonable/abnormal fears; irrational lack of cooperation; and being influenced by a hallucination.

101. In his 911 call and his behavior witnessed by Defendant Police Officers, Mr. Thomas exhibited such characteristics.

102. Defendant City of Columbus, Ohio directed in its Crisis Intervention Team and Guidelines for Dealing with Mentally Ill Individuals that police officers avoid overreacting; move slowly if possible; be friendly, patient, accepting, and encouraging, but remain firm; recognize that the person may be overwhelmed by sensations, thoughts, frightening beliefs, sounds (voices), or the environment; be aware that the uniform, gun, handcuffs, and baton may frighten the person with a mental illness, so reassure the person that no harm is intended; and recognize and acknowledge that a person's delusionary or hallucinatory experience is real to him/her.

103.    Defendant City of Columbus, Ohio listed in its Crisis Intervention Team and Guidelines for Dealing with Mentally Ill Individuals what police officers should not do: move suddenly, give rapid orders, or shout unless absolutely necessary; touch the individual unless absolutely necessary; crowd the individual; and express anger, impatience, or irritation.

104.    Defendant Police Officers did not comply with the Crisis Intervention Team and Guidelines for Dealing with Mentally Ill Individuals policy in the way they dealt with Mr. Thomas.

105.    Defendant City of Columbus, Ohio trained its police officers to secure a Crisis Intervention Team when dealing with mentally ill individuals.

106.    Defendant City of Columbus, Ohio had a policy that its police officers secure a Crisis Intervention Team when dealing with mentally ill individuals.

107.    Defendant Police Officers had received the training and knew about the policy of securing a Crisis Intervention Team when dealing with mentally ill individuals.

108.    Before ordering Mr. Thomas to put his hands behind his back to be handcuffed Defendant Police Officers did not attempt to secure a Crisis Intervention Team.

109.    Before pummeling Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him, and kneeing him on his right side and his shoulder, until he was handcuffed and then applying a hobble strap to him, Defendant Police Officers did not attempt to secure a Crisis Intervention Team.

110.    Defendant Police Officers had no reason to believe that a Crisis Intervention Team would be unavailable had they attempted to secure one before ordering Mr. Thomas to put his hands behind his back to be handcuffed.

111. Defendant Police Officers had no reason to believe that a Crisis Intervention Team would be unavailable had they attempted to secure one before pummeling Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him, and kneeing him on his right side and his shoulder, until he was handcuffed and then applying a hobble strap to him.

112. Defendant City of Columbus, Ohio trained its police officers to call paramedics or other emergency medical assistance whenever they dealt with an individual who appeared to be suffering from a health crisis, including drug overdose.

113. Defendant City of Columbus, Ohio adopted a policy that its police officers secure paramedics or other emergency medical assistance whenever they dealt with an individual who appeared to be suffering from a health crisis, including drug overdose.

114. Defendant Police Officers had received the training and knew about the policy of securing paramedics or other emergency medical assistance whenever they dealt with an individual who appeared to be suffering from a health crisis, including drug overdose.

115. Before ordering Mr. Thomas to put his hands behind his back to be handcuffed Defendant Police Officers did not attempt to secure paramedics or other emergency medical assistance.

116. Before pummeling Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him, and kneeing him on his right side and his shoulder, until he was handcuffed and then applying a hobble strap to him, Defendant Police Officers did not attempt to secure paramedics or other emergency medical assistance.

117.     Defendant Police Officers had no reason to believe that paramedics or other emergency medical assistance would be unavailable had they attempted to secure them or assistance before ordering Mr. Thomas to put his hands behind his back to be handcuffed.

118.     Defendant Police Officers had no reason to believe that paramedics or other emergency medical assistance would be unavailable had they attempted to secure one before pummeling Mr. Thomas, hitting him on the right side of his face, body slamming him, choke-holding him, and kneeing him on his right side and his shoulder, until he was handcuffed and then had a hobble strap applied to him.

119.     Defendant City of Columbus, Ohio failed to train its police officers in recognizing excited delirium syndrome.

120.     Defendant City of Columbus, Ohio failed to train its police officers in how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome.

121.     Defendant City of Columbus, Ohio failed to adopt a policy addressing how its police officers should safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome.

122.     Defendant City of Columbus, Ohio trained its police officers in using de-escalation tactics for safely interacting with individuals who appeared to be mentally ill but neither described excited delirium syndrome nor trained them about it.

123.     Defendant City of Columbus, Ohio failed to supervise its police officers after their training to ensure that they used de-escalation tactics for safely interacting with individuals who appeared to have excited delirium syndrome.

124.    Defendant City of Columbus, Ohio adopted a policy that police officers should use de-escalation tactics for safely interacting with individuals who appeared to be mentally ill but neither described excited delirium syndrome nor covered it in the policy.

125.    Defendant City of Columbus, Ohio knew that its police officers deviated from its policy on the use of de-escalation tactics for safely interacting with individuals who appeared to have excited delirium syndrome.

126.    Defendant City of Columbus, Ohio failed to supervise its police officers so that they implemented in practice its policy on paper regarding the use of de-escalation tactics for safely interacting with individuals who appeared to be mentally ill.

127.    As a direct and proximate result of the failure of Defendant Police Officers to be trained in how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome and the absence of a Defendant City of Columbus, Ohio policy on such interaction, Defendant Police Officers caused Mr. Thomas' injuries and death.

128.    Defendant Police Officers knew or, unless deliberately indifferent and reckless, should have known that Mr. Thomas was too impaired on the evening of January 14, 2017, and in the early morning hours of January 15, 2017, to comply as quickly as they wanted him to with an order to put his hands behind his back to be handcuffed.

129.    Defendant Police Officers knew or, unless deliberately indifferent and reckless, should have known that using excessive force on Mr. Thomas would inflict injuries and likely be fatal in light of his condition.

130.    Defendant Police Officers knew or, unless deliberately indifferent and reckless, should have known that Mr. Thomas was exhibiting the symptoms of excited delirium syndrome, including his 911 call about hallucinations and ingestion of cocaine.

131.    At no time material to this action did Defendant Police Officers ever doubt that Mr. Thomas was suffering from a mental illness.

132.    At no time material to this action did Defendant Police Officers ever doubt that Mr. Thomas had ingested cocaine and was having an adverse reaction to the cocaine.

133.    Defendant Police Officers did not consult with either mental health professionals or drug treatment providers or counselors before physically forcing Mr. Thomas to submit to being handcuffed and then hobbled.

134.    Defendant Police Officers did not consider whether Mr. Thomas was capable of submitting to being handcuffed or, instead, his reaction to the combination of ingesting cocaine and mental illness rendered him incapable of so submitting.

135.    Had Defendant City of Columbus, Ohio trained its police officers in recognizing excited delirium syndrome and how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome and supervised them to ensure that they implemented their training, Mr. Thomas would not have suffered injuries and died.

136.    Had Defendant City of Columbus, Ohio adopted a policy on recognizing excited delirium syndrome and how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome and supervised its police officers to ensure that they implemented that policy, Mr. Thomas would not have suffered injuries and died.

137.    Defendant City of Columbus, Ohio knew before January 14, 2017, that individuals with whom its police officers dealt had suffered injuries and fatal or near-fatal experiences in circumstances indicating that excited delirium syndrome had been involved.

138.    It was readily foreseeable to Defendant City of Columbus, Ohio before January 14, 2017, that, unless it provided training, adopted a policy, and effectively supervised police

officers to ensure that they were implementing training and a policy on recognizing excited delirium syndrome and how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome, individuals with whom its police officers dealt would suffer injuries and have fatal or near-fatal experiences in circumstances indicating that excited delirium syndrome had been involved.

139.    As a direct and proximate result of Defendants' actions and inactions, Mr. Thomas suffered emotional distress, pain, death, and the loss of future earnings.

140.    As a direct and proximate result of Mr. Thomas' wrongful death, his survivors and heirs have suffered permanent damages, including but not limited to grief, depression, and severe emotional distress; loss of his support services and society, including loss of companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training and education as well as the loss of prospective inheritance; and the expenses of funeral bills and medical treatment.

141.    As a direct and proximate result of Mr. Thomas's wrongful death, his minor children suffered loss of consortium, including but not limited to the services, love, and affection of their father.

## V.    Claims for Relief

### A.    First Cause of Action: Violation of the Fourth and Fourteenth Amendments

142.    Paragraphs 1 through 141 above are realleged and incorporated herein.

143.    By using an objectively unreasonable amount of force in light of the facts and under the circumstances, Defendant Police Officers violated Mr. Thomas' rights under the Fourth and Fourteenth Amendments.

144.     By failing to adopt policies, provide training, and/or effectively supervise implementation of those policies or training to avoid the use of an objectively unreasonable amount of force in light of the facts and under the circumstances, Defendant City of Columbus, Ohio violated Mr. Thomas's rights under the Fourth and Fourteenth Amendments.

**B.     Second Cause of Action: Wrongful Death**

145.     Paragraphs 1 through 141 above are realleged and incorporated herein.

146.     By their actions and inactions, Defendants caused Mr. Thomas' wrongful death, resulting in damages recoverable under R.C. 2125.02.

**C.     Third Cause of Action: Gross Negligence**

147.     Paragraphs 1 through 141 above are realleged and incorporated herein.

148.     By their actions and inactions, Defendant Police Officers and other City employees were grossly negligent in their treatment of Mr. Thomas causing him injury and death.

**D.     Fourth Cause of Action: Loss of Consortium**

149.     Paragraphs 1 through 141 above are realleged and incorporated herein.

150.     By their actions and inactions, Defendants caused Mr. Thomas' minor children to suffer loss of consortium.

**VI.     <u>Prayer for Relief</u>**

WHEREFORE, Plaintiffs pray that this Court:

a.     declare that Defendants City of Columbus, Ohio and Police Officers jointly and severally have violated Mr. Thomas' civil rights, inflicting on him emotional distress, loss of consciousness, suffering and physical pain, and death, and, along with Defendants City employees, wrongfully caused his death and Defendants Police Officers and City employees

have acted in a grossly negligent way that caused his emotional distress, loss of consciousness, suffering and physical pain, and death and his minor children's loss of consortium;

      b.     order such equitable relief as will make Plaintiffs and Mr. Thomas' estate whole for Defendants' unlawful conduct along with monetary relief of pre- and post-judgment interest; costs; and reasonable attorneys' fees;

      c.     enjoin Defendant City of Columbus, Ohio from operating its police division without adequate training, supervision, or policies on recognizing excited delirium syndrome and how to safely interact with, rather than aggravate, individuals suffering from excited delirium syndrome;

      d.     award to Plaintiffs compensatory damages against all Defendants in excess of $1,000,000, and punitive damages, against Defendant Police Officers, in excess of $1,000,000; and

      e.     grant such other relief as the Court may deem appropriate.

Respectfully Submitted,

/s/Sean L. Walton, Jr.                           /s/John S. Marshall
Sean L. Walton, Jr. (0088401)               John S. Marshall (0015160)
swalton@waltonbrownlaw.com              jmarshall@marshallandmorrow.com
Chanda L. Brown (0081076)                Edward R. Forman (0076651)
cbrown@waltonbrownlaw.com               eforman@marshallandmorrow.com
Walton + Brown, LLP                      Samuel M. Schlein (0092194)
395 E. Broad Street, Suite 200               sschlein@marshallandmorrow.com
Columbus, Ohio 43215                    Marshall and Morrow LLC.
(614) 636-3476/Fax: (614) 636-3453       250 Civic Center Dr., Suite 480
                                     Columbus, OH 43215-5296
                                     (614) 463-9790/Fax: (614) 463-9780

                                     **OF COUNSEL:**
                                     Louis A. Jacobs (002101)
*Attorneys for Plaintiff*                   LAJOhio@aol.com
                                     177 19th St., Apt. 9C
                                     Oakland, CA 94612
                                     (614) 203-1255/Fax: (510) 250-9007

## **<u>JURY DEMAND</u>**

Plaintiffs request a trial by a jury of eight (8) persons.


By_____
            Sean L. Walton (0088401)