# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CHANA WILEY,** as Administratrix of the
Estate of Jaron Ben-Rasu Thomas, Deceased

                  Plaintiff,

    **v.**

**CITY OF COLUMBUS, *et al.,***

            Defendants.

**Case No. 2:17-cv-888**

**Judge James L. Graham**

**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This case arises from the decedent's 911 call for help after ingesting cocaine, opiates, and marijuana and does not involve any suspected criminal activity. Police officers and paramedics arrived five minutes later, and the officers immediately attempted to secure the scene for paramedics to administer emergency medical care. Jaron Thomas, in his drug induced state, resisted their efforts, was uncooperative, and prevented paramedics from treating him.

Officers unsuccessfully attempted to use a lesser amount of force, including placing Thomas in handcuffs on the ground. Once they brought him to his feet, Thomas continued to kick at them and flail his legs. Officers put Thomas back on the ground in order to control his feet and legs. After the officers gained control of his feet and legs, paramedics were able to provide emergency medical care. But after paramedics administered Narcan, Thomas went into cardiac arrest, and although his heartbeat was restored, he never regained consciousness and died nine days later.

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment filed by Defendants, the City of Columbus and Officers Michael Alexander, Kyle Andrews, Chase Pinkerman, Richard Shaffner, and Darren Stephens (collectively, "Defendants"),

seeking summary judgment on Plaintiff Chana Wiley's claims alleging: 1) excessive use of force in violation of the Fourth and Fourteenth Amendments, brought pursuant to 42 U.S.C. § 1983; 2) wrongful death in violation of Ohio Rev. Code § 2125.02; 3) gross negligence; and 4) loss of consortium. (Am. Compl. ¶¶ 161–170, ECF No. 17 at 130–131.)

The Court held oral argument on Defendants' Motion for Summary Judgment on May 7, 2021.

Plaintiff's claims rest on the proposition that after returning Thomas to the ground, an officer applied compressive force, which interfered with his breathing, by placing his knee on Thomas's upper back while he was lying face down. Plaintiff argues that this resulted in asphyxiation and was excessive in light of the Sixth Circuit's decision in *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004). After carefully considering the record evidence and construing it in the light most favorable to Plaintiff, the Court finds that there is no evidence from which a jury could reasonably find that after returning Thomas to the ground, an officer applied a knee to his upper back while he was lying face down, or any other kind of compressive force to his back, chest, neck, or throat. Finding that the force actually used was reasonable under the circumstances, the Court **GRANTS** Defendants' Motion for Summary Judgment. (ECF No. 31.)

In the alternative, the Court finds that at the time of the incident, no reasonable officer could have known that the amount of force actually applied under the circumstances was a violation of Thomas's constitutional rights. Accordingly, Defendant Officers are also entitled to judgment as a matter of law based on the defense of qualified immunity.

## I. BACKGROUND

### A. The 911 Call and Initial Officer Response

On January 14, 2017, Thomas called 911 and requested an ambulance, because he was "doing cocaine," thought he might be overdosing, his "heart [was] pounding," and he kept "hearing these voices" that made him feel "really paranoid." (Defs.' Ex. D, ECF No. 31-13 at 241–42.) Columbus police officers and Mifflin Township paramedics were quickly dispatched to the residence where Thomas reported he was located. (Defs.' Ex. H, ECF No. 31-7 at 261.)

Five minutes later, Defendant Officer Pinkerman arrived at the scene at 11:52:08 p.m. (*Id.*; Defs.' Ex. E, ECF No. 31-4 at 248.) Less than one minute later, paramedics Kyle Gibson and Joshua Burke staged nearby, awaiting police officers to signal that the scene was secure for them to go in and make patient contact. (Defs.' Ex. H, ECF No. 31-7 at 261; Burke Dep. 22, ECF No. 31-14 at 433; Gibson Dep. 32–33, ECF No. 31-15 at 469.) Upon receipt of an overdose call, it is customary for police officers to first ensure the scene is safe before paramedics enter the scene to treat the patient. (Alexander Dep. 124, ECF No. 31-12 at 324; ECF No. 31-15 at 471.)

The scene was far from secure when Pinkerman arrived. When Pinkerman knocked on the front door of the residence, he heard a male screaming and someone falling down the stairs. (Pinkerman Dep. 24, ECF No. 31-16 at 499.) Soon after, the front door abruptly flew open, and a man later identified as Thomas ran screaming past Pinkerman and fell onto the front lawn. (*Id.*)

After Thomas fell onto the lawn, Pinkerman ordered him to remain on the ground and put his hands behind his back. (*Id.* at 500.) Thomas failed to comply, got to his feet, and ran toward the street. (*Id.*) Pinkerman again ordered Thomas to stop and show his hands. (*Id.*) Thomas did not stop, but soon fell to the ground and began "violently rolling around and sporadically contorting his body . . . as if he was having a seizure." (*Id.* at 500, 517.) Though Pinkerman did

not know for sure whether this person was the 911 caller, he thought that the man on the ground was overdosing on drugs due to his erratic behavior. (*Id.* at 500.)

Then, Thomas got back up and continued running, and Pinkerman eventually closed the distance between them, and when Thomas fell yet again, Pinkerman fell on top of him. (*Id*. at 518.) Thomas never complied with any of Pinkerman's commands. (ECF No. 34 at 611.)

Once Thomas was back on the ground, he actively resisted Pinkerman's efforts to subdue him. (ECF No. 31-16 at 501.) Pinkerman eventually handcuffed Thomas's left wrist but struggled to gain control of his right hand. (*Id.*) Defendant Officer Stephens arrived to assist Pinkerman with handcuffing Thomas's right hand, as Thomas was "pulling Officer Pinkerman back and forth." (Stephens Dep. 38, 41, ECF No. 31-18 at 566.) But even with Stephens's assistance, Thomas continued "aggressively resisting." (*Id.*)

Stephens explained that their "goal at that point [was] to secure this person to alleviate any threat," and "if we [couldn't] get this person secured, we [couldn't] call for the medics . . . to . . . come in [and] deliver the medical assistance that's needed [for] the person [who] made that phone call. So our biggest goal at that point [was] to make the scene safe so we [could] call for medics." (*Id.* at 558.)

Defendant Officer Alexander arrived while Pinkerman and Stephens struggled to control Thomas. (Alexander Dep. 7, ECF No. 31-12 at 295.) According to Alexander, Thomas was "kicking . . . squirming, [and] moving around," so Alexander grabbed Thomas's feet, crossed his ankles, and folded his legs towards his buttocks to assist Pinkerman and Stephens in gaining control of him. (*Id.* at 295, 301.) Alexander used a trained technique referred to as the "maximum

resistor" technique, whereby an officer crosses a subject's legs while in a prone position, bending the legs at the knees, and holding the feet to the buttocks.[1] (Defs.' Ex. O, ECF No. 36-3.)

Alexander explained that he controlled the bottom portion of Thomas's legs, so that he was unable to kick or push. (ECF No. 31-12 at 304.) As Thomas continued pulling away from the officers, Pinkerman delivered a knee strike to the right side of Thomas's abdomen. (Pinkerman Dep. 36, ECF No. 31-16 at 502.) Thomas finally released his right hand from underneath his body, and the officers handcuffed his right wrist. (*Id.*)

Although "Thomas continued to contort his arms, shoulders, and torso," Alexander let go of his feet, and Pinkerman, Stephens, and Alexander then stood Thomas up and attempted to walk him to a police cruiser. (ECF No. 31-12 at 295, 323; ECF No. 31-18 at 558; ECF No. 34 at 622.) At this point, the officers signaled paramedics to come to the scene. (ECF No. 31-7 at 261.)

Plaintiff does not claim that any of these measures were excessive. On May 4, 2021, Plaintiff's counsel informed the Court and defense counsel in writing by letter of that date stating that "Ms. Wiley has decided to abandon her claims on the first two segments — the initial response when Mr. Thomas emerged from the residence . . . and the later response when officers got him to the ground . . . and pursue only the last [] segment when . . . Officers Shaffer [sic], Stevens [sic], and Andrews placed [Thomas] on the ground and used force." (ECF No. 43 at 865.) Plaintiff's claims are therefore limited to what occurred after Thomas was brought to his feet and then returned to the ground.

---

[1] The "maximum resistor" technique "is a trained technique for restraint designed to facilitate the application of further restraints, and does not preclude the use of handcuffs." (Defs.' Ex. O, ECF No. 36-3 at 843–44.) After crossing an individual's feet, officers move the feet up towards the buttocks, which keeps the individual from moving around, and then apply a hobble strap. (ECF No. 31-18 at 570.)

**B. Officers Place Thomas on the Ground a Second Time**

Defendant Officers Andrews and Shaffner arrived before the medics, while Thomas was standing, handcuffed. (Shaffner Dep. 30, ECF No. 31-17 at 532.) "Thomas continued to move around and pull away from the officers after he [was] brought to his feet." (ECF No. 17 at 117.) Alexander observed that Thomas "was still combative . . . kicking [and] dropping his body weight," and Pinkerman said Thomas was "kicking to the front, kicking to the back . . . [and] trying to get away from our control." (ECF No. 31-12 at 295, 323; ECF No. 31-16 at 503.)

At that point, the officers laid Thomas back on the ground and told Alexander to get a hobble strap to secure his feet.[2] (ECF No. 31-12 at 295.) A hobble strap "is a black nylon strap that goes around the ankles and attaches to the handcuffs." *State v. Davis,* No. 99AP-1428, 2000 Ohio App. LEXIS 4429, at *5 (Ohio Ct. App. Sep. 28, 2000). "A hobble strap controls a person's feet . . . it goes around their feet, and then when they stand up to walk, [officers] move it up around their knees so they can move their feet to walk." (ECF No. 31-17 at 536.) Alexander explained that Thomas was placed back on the ground in order to apply a hobble strap, for the purpose of preventing him from kicking officers or paramedics. (*Id.* at 316.) As Alexander further explained, "We can't get him medical attention until he is cooperating. If he's not going to cooperate himself, then we have to make sure that he's not going to kick a medic, he's not going to kick us." (*Id.*)

While Alexander was retrieving a hobble strap from one of the police cruisers, Thomas continued kicking, so Andrews crossed Thomas's legs, bent them at the knee, and placed Thomas's legs against his buttocks. (ECF No. 31-13 at 381.) Andrews then kneeled against Thomas's legs

---

[2] After Thomas was placed back on the ground, Pinkerman went to his cruiser to positively identify the man on the ground. (ECF No. 31-16 at 504.) Once back at his cruiser, Pinkerman identified the man as Thomas. (*Id.* at 505.)

by placing his knee across Thomas's ankles and applying some of his body weight to prevent Thomas from kicking his legs. (*Id.* at 389; ECF No. 34 at 627.)

On the other side, Shaffner held Thomas's handcuffs and applied pressure with his left knee to Thomas's lower back/hip area, just above his buttocks to control his hips and keep him on the ground until Alexander returned with the hobble strap. (ECF No. 31-13 at 381–82; ECF No. 31-17 at 538.) Stephens was on the right side of Thomas, and his knees were placed against the side of Thomas's shoulder to further inhibit his movements. (ECF No. 31-18 at 571.) The officers' goal was to prevent Thomas from moving, get his "feet up, put the hobble strap[] on and then move his body to his side," so that he could be secured for the paramedics' impending arrival. (ECF No. 31-13 at 381, 383; ECF No. 31-18 at 570–71, 573.)

Thomas was lying on the ground in this position for about ninety seconds while Alexander was trying to find a hobble strap. (ECF No. 31-13 at 390.) Then, Thomas stopped resisting, and Andrews and Shaffner noticed a change in his breathing. (*Id.* at 383.) Andrews observed "that it was a little deeper and had slowed a bit." (*Id.* at 370.) They immediately rolled Thomas onto his side. (*Id.* at 383.) When Alexander returned with a hobble strap, another officer informed him that it was no longer needed, and so the hobble strap was not applied to Thomas. (ECF No. 31-12 at 295.)

### C. The Paramedics' Arrival

Paramedics Kyle Gibson and Joshua Burke arrived as Thomas was being rolled onto his side. (ECF No. 31-13 at 390; ECF No. 31-15 at 470.)

Upon his arrival, Gibson observed that Thomas appeared conscious, was breathing in and out at a rate of six-to-ten times a minute, and mumbling words. (ECF No. 31-15 at 470.) Gibson believed that Thomas's labored breathing was due to an overdose of opiates, a respiratory

depressant. (*Id.* at 471.) He also observed "pinpoint pupils," which he stated is "a telltale sign [of] opiates." (*Id.* at 472.) Gibson explained, "I know that if someone is overdosing, they're going to keep depressing, depressing, until they're no longer breathing; so we need to get [Narcan] on board as fast as we can." (*Id.* at 474.)

Thomas was immediately secured to a cot and given Narcan to elevate his respiratory rate. (*Id.* at 472; ECF No. 31-6 at 254.) At 12:02 a.m., the paramedics advised officers that Thomas was in stable, non-life-threatening condition, and Stephens aired that information. (ECF No. 31-7 at 261; ECF No. 31-18 at 559.) At 12:06 a.m., Thomas stopped breathing and went into cardiac arrest. (ECF No. 31-6 at 254; ECF No. 31-15 at 477.) The paramedics obtained a return of spontaneous circulation ("ROSC") to Thomas's heart at 12:18 a.m. and departed for the hospital. (ECF No. 31-6 at 255.)

### D. Thomas at the Hospital

Thomas arrived at the hospital in critical condition. (ECF No. 31-11 at 291.) His treating physician noted that Thomas's lower ribs had a good, though subtle respiratory motion, but he continued to have seizure-like activity. (*Id.* at 290–91.) Thomas's drug screen was positive for marijuana, cocaine, and opiates. (*Id.* at 291.)

Thomas never regained consciousness. On January 23, 2017, nine days after arriving at the hospital, he died. (Defs.' Ex. I, ECF No. 31-8 at 262.)

### E. Cause of Death

The Franklin County Coroner's Office determined that the cause of Thomas's death was "anoxic encephalopathy" as a consequence of "cardiac arrest" as a consequence of "cocaine induced delirium." (*Id.* at 263.)

Plaintiff's medical expert, Dr. Francisco Diaz, disagrees and opines instead that Thomas's cardiac arrest was caused by "forcible restraint that precluded adequate breathing." (Pl.'s Ex. F, ECF No. 34-6 at 709.)

Thus, there is a material dispute as to the cause of Thomas's death precluding summary judgment on that issue.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013) (internal citation omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The critical question here is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

"The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted). "Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn,* No. 10–3110, 2011 WL 4469612, at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party

maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record").

"The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts. [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.,* 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotations and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III. DISCUSSION

Defendants seek judgment in their favor on Plaintiff's claims of: 1) excessive use of force in violation of the Fourth and Fourteenth Amendments, brought pursuant to 42 U.S.C. § 1983; 2) wrongful death in violation of Ohio Rev. Code § 2125.02; 3) gross negligence; and 4) loss of consortium.

### A. Plaintiff's § 1983 Claims Against Defendant Officers

Plaintiff claims that the Defendant Officers, whom she is suing in both their individual and official capacities, were inadequately trained by the City of Columbus, and applied excessive force in their attempt to restrain Thomas, which caused him to lose consciousness and die nine days later. In her response in opposition to Defendants' Motion for Summary Judgment, Plaintiff specifies that she is asserting that, "[t]he Defendant Officers directly involved in the fatal segment were Kyle Andrews, Richard Shaffner, and Darren Stephens." (ECF No. 34 at 642.)

At oral argument, Plaintiff further clarified that she is only pursuing claims against Andrews, Shaffner, and Stephens for: 1) Andrews's use of the maximum resistor position once Thomas was placed on the ground for the second time; 2) Shaffner's alleged use of his knee on Thomas's upper back while he was lying face first on the ground, compromising his ability to breathe; and 3) Stephens's alleged failure to intervene.

Inasmuch as Pinkerman and Alexander had no role in what occurred after Thomas was brought to his feet, they are entitled to judgment as a matter of law.

### B. Qualified Immunity Defense

Andrews, Shaffner, and Stephens assert the affirmative defense of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The issue of qualified immunity is essentially a legal question for the court to resolve." *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway,* 510 U.S. 510, 516 (1994)). Courts "ask two questions in evaluating whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: '(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident.'" *Roell v. Hamilton Cty.,* 870 F.3d 471, 480 (6th Cir. 2017) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)). These two questions may be addressed in any order. *Pearson,* 555 U.S. at 236. If either question "is answered in the negative, then qualified immunity protects the officer from civil damages." *Goodwin v. City of Painesville,* 781 F.3d 314, 321 (6th Cir. 2015) (citing *Martin v. City of Broadview Heights,* 712 F.3d 951, 957 (6th Cir. 2013)). When a defendant raises qualified

immunity as a defense, the plaintiff has the burden of demonstrating that the defendant is not entitled to qualified immunity. *Everson,* 556 F.3d at 494.

### C. Violation of a Constitutional Right

Plaintiff's claim is premised on her allegation that Andrews and Shaffner used excessive force to subdue Thomas the second time he was placed on the ground.

Traditionally, courts evaluate an excessive force claim under an objective-reasonableness test of "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The three *Graham* factors are: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

But where the *Graham* test does not fit, "because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer," the Sixth Circuit requires that a "more tailored set of factors be considered in the medical-emergency context" to determine whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. *Estate of Hill*, 853 F.3d at 314. In the emergency medical context, the Court should ask:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?

(3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.*

"If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.* This medical emergency focused inquiry assists courts in this circuit "in resolving the ultimate issue of 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Id.* (quoting *Graham,* 490 U.S. at 397.)

In the case at bar, the Court concludes that after applying the *Estate of Hill* factors to the record evidence viewed in the light most favorable to Plaintiff, Andrews and Shaffner did not use excessive force against Thomas when restraining him on the ground for the purpose of allowing paramedics to safely enter the scene and administer emergency medical treatment.

Regarding the first factor, Thomas was undisputedly experiencing a medical emergency that rendered him incapable of making a rational decision during officers' response to his 911 call due to his ingestion of multiple drugs, resulting excited delirium, and paranoia. Plaintiff correctly asserts that Thomas was "tremendously impaired," acting bizarrely, "and unable to follow officers' orders or enter into a rationale [sic] conversation" and that Thomas "was out-of-control due to his medical crisis and use of cocaine" during the final segment. (ECF No. 34 at 644, 648.)

Not only was Thomas incapable of making a rational decision under the circumstances, but he also posed an immediate threat of physical danger to paramedics while aggressively kicking and flailing.[3] And, Thomas posed an immediate threat of physical harm to himself by actively resisting officers' efforts to subdue him and delaying his emergency medical treatment.

---

[3] During oral argument, Plaintiff's counsel agreed that Thomas's flailing legs would create some danger to the medics if trying to treat him. (Oral Arg. Tr. 30:11–13, ECF No. 44 at 895.)

Thomas self-reported that he was overdosing on cocaine and fearful of a heart attack. Soon after Pinkerman arrived, he observed Thomas seizing on the ground and thought he was overdosing. These circumstances required immediate emergency medical assistance. But while Thomas remained uncooperative and combative, paramedics could not treat him. Therefore, Thomas's "mental and physical state rendered him 'at a minimum, . . . a threat to his own safety.'" *Estate of Hill,* 853 F.3d at 315 (quoting *Caie v. W. Bloomfield Twp.,* 485 F. App'x 92, 95 (6th Cir. 2012)).

As to the second factor, some amount of force was therefore necessary to alleviate the immediate threat Thomas posed to paramedics, and most critically, to himself.[4] *Pennington v. Terry,* 644 F. App'x 533, 544 (6th Cir. 2016) (recognizing "that law enforcement may constitutionally apply force to neutralize a safety threat to the plaintiff himself."). By continuing to kick and flail his legs after he was handcuffed and put on his feet, Thomas actively impeded the officers' attempts to secure emergency medical treatment for him. *Roell,* 870 F.3d at 482 (6th Cir. 2017) (finding Roell's kicking and flailing while officers attempted to restrain him to be active resistance); *see also Rudlaff v. Gillispie,* 791 F.3d 638, 641 (6th Cir. 2015) (cleaned up) ("Active resistance includes physically struggling with, threatening, or disobeying officers.")

It is undisputed that Thomas remained combative after officers brought him to his feet and the paramedics were on their way. Because Thomas remained uncooperative and combative while in need of emergency medical treatment, officers placed him back on the ground to secure his feet with a hobble strap in order to protect the medics who were on their way to treat him.[5]

---

[4] Plaintiff admits there was a "need . . . to keep Mr. Thomas, then handcuffed and experiencing a medical crisis and the effects of cocaine use, from hurting himself or others or fleeing." (ECF No. 34 at 649.)

[5] It should be noted that this is the same device that officers successfully applied to subdue the decedent in *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004), where the Sixth Circuit determined officers used excessive force, because they applied force *after* the application of the hobble strap. Here, though officers intended to apply a hobble strap, one was never applied to Thomas.

Plaintiff argues that officers failed to use de-escalation techniques or call a crisis intervention team specializing in mental health crises,[6] but this argument misses a critical point. Thomas needed immediate medical attention, and time was of the essence. As Gibson explained, "if they took a high enough dose of it . . . they're going to go into respiratory arrest and then falling into cardiac arrest." (ECF No. 31-15 at 479.) Furthermore, there is no record evidence supporting the proposition that de-escalation techniques are required or effective in cases of drug induced delirium.

It is undisputed that Thomas failed to respond to officers' orders, and as the Sixth Circuit pointed out in *Roell,* "no caselaw supports [the] assertion [that officers] were prohibited from using any physical force . . . before first attempting alternative de-escalation techniques." 870 F.3d at 482. Therefore, due to Thomas's lack of cooperation and active resistance to officers' efforts, some amount of force was reasonably necessary to secure immediate emergency medical treatment for him.

Addressing the third and final factor concerning whether Andrews's and Shaffner's applications of force were excessive, the Court finds their uses of force were objectively reasonable under the emergency circumstances they faced. Thomas actively resisted while officers were rapidly trying to facilitate emergency medical assistance. But unless officers could effectively subdue Thomas, emergency medical personnel could not offer assistance. As Burke explained,

---

[6] The record in this summary judgment proceeding includes a copy of the report of Plaintiff's use of force expert, Geoffrey P. Alpert. (Pl.'s Ex. D, ECF No. 34-4.) Alpert lists all of the documents he relied upon in arriving at his opinions. They include many which are not a part of the record in this case and many which consist of unsupported hearsay. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 580 (6th Cir. 2012) ("[H]earsay evidence cannot be considered on summary judgment.") Much of his report is devoted to events which are no longer part of Plaintiff's claims in this case, and his report repeatedly refers to Thomas being "hogtied," something which Plaintiff's counsel has disavowed (ECF No. 44 at 887–88), and which is not supported by the record evidence. His opinions on the reasonableness of the officers' actions in this case are legal issues which the Court must decide. "The reasonableness of officer conduct in excessive-force cases is a question for the court." *McKenna v. Edgell,* 617 F.3d 432, 441 (6th Cir. 2010). Nothing in his report creates genuine disputes of fact which would preclude granting summary judgment.

"[T]here's always a concern to get there as soon as possible [for an overdose call], but we also have to take our safety into consideration too, because if we're hurt, we can't perform our task, then we're not able to do any good for the patient." (ECF No. 31-14 at 442.)

It is undisputed that minutes earlier, three officers struggled to handcuff a non-compliant Thomas the first time he was on the ground. It is further undisputed that after being handcuffed on the ground, Thomas remained combative and continued kicking and flailing even after officers brought him to his feet in an effort to secure him for the paramedics' arrival.

Officers knew Thomas needed to be subdued to receive medical treatment, so he was placed back on the ground, so that his legs and feet could be restrained. As the undisputed record evidence demonstrates, officers' previous attempts to subdue Thomas were unsuccessful, and the paramedics were staged nearby and waiting to administer treatment. It was therefore objectively reasonable for Andrews and Shaffner to perceive that it was necessary to apply pressure to Thomas's legs and lower back/hip area to temporarily restrain his legs and feet until either a hobble strap could be applied, or he became compliant enough to receive emergency medical treatment.

While Plaintiff argues that Thomas was "suffering from the effects of cocaine use," and Andrews and Shaffner should have taken his diminished capacity into account,[7] this did not preclude them from using a reasonable amount of force to bring Thomas under control to facilitate emergency medical treatment for his self-reported overdose. *Roell,* 870 F.3d at 482 (agreeing "with the district court's observation that 'the fact that Roell's resistance was probably caused by his excited delirium did not preclude the deputies from using a reasonable amount of force to bring him under control.'")

---

[7] There is no record evidence that Andrews and Shaffner were aware that Thomas suffered from a history schizoaffective disorder as indicated in Thomas's hospital records. (ECF No. 31-11 at 292.)

Plaintiff claims that Andrews and Shaffner applied substantial pressure to Thomas's upper back while he was lying face down in a prone position and that this would constitute excessive force under *Champion*. The record evidence does not support her assertion.

There is no record evidence that either Andrews or Shaffner applied any pressure to Thomas's mid or upper back, chest, or torso while he was lying on the ground. Instead, Andrews applied pressure to his *legs* while Shaffner applied pressure to Thomas's *lower back/hip area*. Their testimony to this effect is uncontradicted. Andrews and Shaffner used these techniques to control Thomas's kicking and flailing legs for a limited time until Alexander could return with a hobble strap, which they needed to secure his legs and feet in order to protect the medics who were on their way. When they noticed Thomas had difficulty breathing, they immediately rolled him over to his side, and the paramedics simultaneously arrived and began treating him.

Plaintiff points to a photograph of a bruise on the upper part of Thomas's back and asserts that Shaffner caused this bruise by applying pressure to Thomas's upper back with his knee, but she points to no record evidence that this bruise was in fact caused by Shaffner's knee.[8] The record evidence only shows that Shaffner applied his knee to the lower back/hip area to temporarily restrain Thomas's hips to facilitate emergency medical assistance. (ECF No. 31-17 at 537–38, 545–46.)

Plaintiff argues that Shaffner's deposition testimony supports her assertion that Shaffner placed his knee on Thomas's upper back, but Shaffner's deposition testimony does not support that argument. When questioned by Plaintiff's counsel, Shaffner emphasized he "had pressure on

---

[8] At oral argument, Plaintiff cited the report of her medical expert, Dr. Diaz, as evidence of the source of Thomas's bruise, but Diaz's report only opines as to the cause of Thomas's death, not the source of the bruise on his upper back. Diaz seems to assume, without evidence, that some officer applied pressure to Thomas's upper back while he was prone.

his hips" and when asked if "[i]t could have been in . . . [the] *lower back/hip area*," Shaffner responded, "[i]t could have been." (*Id.* at 538.) (emphasis added)

When further questioned about the placement of his knee, and whether "it could have been in the middle of [Thomas's] back," Shaffner insisted, "I was sure to have it on his hips. Like I said, control the hips, control the body." (*Id.* at 545–46.) Moreover, when confronted with the photograph of the bruise on Thomas's upper back, Shaffner expressly denied placing his knee there.

> Q. Okay. And do you see the large bruise there?
> A. Yes.
> Q. Okay. Is it your testimony that your knee pressure was not in this area?
> A. Yes, it was not in that area.
> Q. Okay. Would you have put your knee pressure in that area?
> A. No.
> Q. Why not? Why would you not have done that?
> A. Because he was already handcuffed. His shoulders were already in control from his hands being handcuffed. So I don't need to control what his arms are doing because those are controlled by the handcuffs and I have a hold of those. So just the hips [are] what I am worried about.

(*Id.* at 546.)

Although he conceded that he might have placed his knee in the lower back/hip area, Shaffner consistently and repeatedly denied placing his knee on Thomas's upper back.

Plaintiff also argues that Medic Kyle Gibson's deposition testimony supports the proposition that Shaffner applied force to Thomas's upper back. However, Gibson's deposition testimony does not contradict any of Shaffner's testimony regarding the location of his knee.

During his deposition, Gibson was questioned about an audio recording of his interview by an unidentified Detective Sheppard. After playing part of the audio recording, counsel asked Gibson about his interview, and he testified as follows:

> Q. What you'll see here is a transcript that was made by a court reporter, based on the audio interview that you mentioned earlier with Detective Sheppard. I know you have not had a chance to review this transcript and

sign for it and made [sic] changes, so we'll listen to the audio and use the
transcript here as kind of a read along.
A. Okay.
(PLAYBACK OF AUDIO RECORDING BEGINS.)
(PLAYBACK OF AUDIO RECORDING PAUSED.)
I'll stop there.
Q. So when you approached, you saw one of the officers with his knee on
Mr. Thomas's back to keep him from resisting?
A. So this was done a lot – I mean, we're talking about January 2017, so
this was more fresh. So I can't tell you right now, yeah, that's it, but at
that time, if that's what I said, I believe that's what I saw.
Q. But at this point you don't recall whether that took place or not?
A. No, I don't.
Q. Okay.
(PLAYBACK OF AUDIO RECORDING RESUMED.)
(PLAYBACK OF AUDIO RECORDING PAUSED.)
Q. Does that refresh your memory at all?
A. Just on the left side. I mean, the only thing I can recall from there is
remembering he was on his side. I believe I said earlier that it was his left
side, that I thought that I remembered it was on the left side.
Q. Okay.

(ECF No. 31-15 at 482.)

Gibson said he does not have a present recollection of seeing an officer with his knee on

Thomas's back, but construing his deposition testimony in the light most favorable to Plaintiff, it

is conceivable that upon further questioning, Gibson might say that his memory was refreshed.

But even that would not be availing in Plaintiff's efforts to create a genuine dispute of fact that

Shaffner, contrary to his clear sworn testimony, applied force to Thomas's *upper* back and/or that

he was responsible for the bruise in the photograph (which was not shown to Gibson during his

deposition).

There are numerous other potential sources of this bruise, including the undisputed fact

that Thomas fell down a flight of stairs prior to running screaming from the residence, that he fell

down several times afterwards, was violently rolling around on the ground, that Pinkerman fell on

top of him in the street, and that Pinkerman was on top of his back trying to handcuff him while

Stephens assisted. Plaintiff has not eliminated the other potential causes of the bruise and has not

19

presented sufficient evidence from which a jury could reasonably conclude that the bruise was caused by Shaffner's knee on Thomas's upper back.

Considering all of the facts in the record, it is mere speculation that the bruise was caused by Shaffner's knee. "While the facts are normally taken as alleged by the plaintiff, facts that absolutely contradict the record will not be considered as claimed by the plaintiff." *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009) (citing *Marvin v. City of Taylor,* 509 F.3d 234, 249 (6th Cir. 2007)). In the instant case, some of Plaintiff's alleged facts are contradicted by record evidence, such as uncontradicted sworn testimony. Shaffner clearly denied under oath that he placed his knee where the bruise appears on Thomas's back, and his deposition testimony is not contradicted by any direct or circumstantial evidence from which a reasonable jury could find that his testimony is untrue.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Andrews's and Shaffner's actions did not amount to constitutionally excessive force, and they are entitled to judgment in their favor on Plaintiff's excessive use of force claim. As there was no constitutional violation, Stephens did not have a duty to intervene, and he is entitled to judgment as a matter of law on Plaintiff's § 1983 claim against him.

### D. Clearly Established Constitutional Right

Even if the Court determined that a constitutional violation had occurred, the law as of January 14, 2017, was not clearly established that police officers responding to a medical emergency call could not apply pressure to the legs and lower back/hip area of a combative, non-compliant person to secure emergency medical treatment.

The sources of clearly established law are "'first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other

circuits.'" *Martin,* 712 F.3d at 961 (quoting *Champion,* 380 F.3d at 902). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018). While there is not a requirement for "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby,* 138 S. Ct. at 590. "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier* v. *Katz,* 533 U. S. 194, 202 (2001)). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014)).

Plaintiff bears the burden of demonstrating that a right is clearly established. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004).

Plaintiff argues that under *Champion,* it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 380 F.3d at 903.

Plaintiff also draws this Court's attention to *Martin,* where the Sixth Circuit stated, "In *Champion*, we held that applying pressure to the back of a prone suspect who no longer resists arrest and poses no flight risk is an objectively unreasonable use of force." 712 F.3d at 961. The Sixth Circuit further clarified its holding in *Champion* by stating, "The better view is that

*Champion* proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others." *Id.*

The present case is distinguishable from both *Champion* and *Martin.*

In *Champion,* the decedent "stopped resisting arrest and posed no flight risk" when officers "sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device." In contrast, Thomas repeatedly physically resisted officers' efforts to secure his feet and legs by kicking and flailing. Further, he was not immobilized by a hobble strap and had not been subdued while on the ground, when Shaffner put his knee on Thomas's lower back/hip area. 380 F.3d at 901.

This case is further distinctive from *Champion* because Andrews and Shaffner did not apply any compressive pressure to Thomas's mid or upper back or his neck, and therefore did not create asphyxiating conditions. *See Hopper v. Montgomery Cty.*, 310 F. Supp. 3d 911, 926 (S.D. Ohio 2017) (discussing compressional force as the defining feature of positional asphyxia by "not allowing the chest to expand fully" and involves pressure on the torso, the upper back, and/or neck), *aff'd, Hopper v. Plummer,* 887 F.3d 744 (6th Cir. 2018). When Shaffner was asked under oath if he was concerned, at the time of the incident, that the pressure he was placing on Thomas's hips and lower back might risk positional asphyxia, he responded no, "[b]ecause he didn't have any pressure on his chest, his breathing cavity," and that based on his training and experience as a police officer, there must be "pressure on the chest area, the area where the lungs are" to create a risk of positional asphyxia. (ECF No. 31-17 at 543.) Not only does the record evidence indicate that Andrews and Shaffner did not use substantial or significant pressure to create asphyxiating conditions, but it also demonstrates that officers applied pressure to restrain Thomas, whose

combative actions, unlike in *Champion* where the subject was already fully restrained, posed a material danger to paramedics, who could not treat him until he was subdued.

Here too, unlike *Champion* where genuine disputes of fact were created by the testimony of five lay witnesses, there are no witnesses to contradict the testimony of any of the officers involved.

The instant case is also distinguishable from *Martin,* where the Sixth Circuit held that "[a] reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force." 712 F.3d at 963. The *Martin* court determined that those actions were "severe," especially in light of the fact that Martin did not pose a serious safety risk to others. *Id.* at 962.

Unlike *Martin,* Thomas posed a serious safety risk to paramedics, and Andrews and Shaffner did not use compressive body weight to subdue him. The "compressive body weight" used in *Martin*, included an officer laying "on Martin, belly to back," another officer falling on top of Martin, and yet another officer using "force to keep him down." *Id.* at 959. While Martin was on the ground, he had "three officers on top of him." *Id.* These facts are not present in the instant case, as there is no evidence that any officer lay on top of Thomas or used compressive body weight to subdue him. Therefore, *Martin* did not put the officers on notice that their actions violated Thomas's clearly established right to be free from excessive force.[9]

_____

[9] Though Plaintiff highlights the May 2, 2013 Columbus Police Legal Advisor's Update discussing the *Martin* case and argues that the Legal Advisor's Update put officers on notice about the dangers of positional asphyxia, the record evidence shows that Andrews and Shaffner did not apply compressive body weight, did not use severe force, including a neck restraint, and therefore did not create asphyxiating conditions constituting excessive force, as described in *Martin*.

Further instructive is a case from another district court in this circuit where the court found at the time of the alleged violation, the law was not clearly established "that a person suffering from a medical condition, who became combative toward police officers responding to a call for medical assistance had a right not to be subjected to" the force employed to facilitate medical treatment for him, which included an officer lying on top of the individual while several other officers assisted in holding down the individual's arms and legs while he continued to kick, scream, and flail and another held down his "legs and hips in order to prevent him from kicking" until he was secured to a medical cot. *Dunfee v. Finchum,* 132 F. Supp. 3d 968, 972–73, 979–80 (E.D. Tenn. 2015).

At the time of the incident, no reasonable officer would have known that applying pressure to the legs and lower/back hip area of a kicking and flailing individual who needed emergency medical treatment, posed a threat to paramedics' safety, and needed to be subdued for paramedics to administer medical assistance, violated that person's constitutional rights. Andrews's and Shaffner's conduct was therefore not clearly prohibited in the circumstances before them, and they acted reasonably in the particular circumstances they faced.

Plaintiff bears the burden of demonstrating that a right is clearly established, and the Court finds that Plaintiff has not presented sufficient case law clearly establishing that police officers responding to a medical emergency call could not apply pressure to the legs and lower back/hip area of a combative, non-compliant person to subdue the person, so that he or she could receive emergency medical treatment. Therefore, Andrews and Shaffner are also entitled to qualified immunity under this prong of the qualified immunity analysis.

### E. Plaintiff's Claims Against the City of Columbus

The Sixth Circuit recognizes that "'[a] municipality . . . cannot be liable under § 1983 absent an underlying constitutional violation by its officers.'" *Roell,* 870 F.3d at 487 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004)).  As the Court found that there was no constitutional violation under the first prong of the qualified immunity analysis, the Court finds there is no municipal liability in the instant case and grants summary judgment to Defendant City of Columbus on Plaintiff's claims against it.

Even if the Court had found that the officers had committed an underlying constitutional violation, the City of Columbus would still not be subject to municipal liability under § 1983 for lack of adequate training.

A city may only be held liable under § 1983 "if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  For the City of Columbus to be liable for inadequate police training under § 1983 in the instant case, "plaintiff must show '(1) that [the] training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the City's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

Here, Plaintiff claims that the City of Columbus "failed to train its police officers in safely restraining [prone] individuals." (Am. Compl. ¶ 156, ECF No. 17 at 129.)  Plaintiff later claims at summary judgment that the City of Columbus was deliberately indifferent in failing to implement its policy against officers pressing on a subject in a prone position. (ECF No. 34 at 656.)

Even construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, "[t]o establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Slusher*, 540 F.3d at 457 (quoting *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005)).

The City of Columbus argues that Plaintiff has failed to set forth any prior instances of unconstitutional conduct demonstrating that the City ignored a history of abuse, or that it was even on notice that its training or policy implementation was deficient in this area.[10]  The Court agrees that Plaintiff has not pointed to any record evidence indicating a demonstrated history of abuse, similar incidents, or notice.  Absent these facts, Plaintiff has failed to establish the required showing for the failure to train or implement existing policy portion of her § 1983 municipal liability claim.

Moreover, the Sixth Circuit "has consistently held that a municipality cannot be held liable on a failure to train theory where a right was not clearly established." *Tlapanco v. Elges*, 969 F.3d 638, 657 (6th Cir. 2020) (collecting cases); *see also Stewart v. City of Euclid,* 970 F.3d 667, 676 (6th Cir. 2020) ("[The decedent's] rights were not clearly established in the precedent of this circuit or otherwise. Thus, violation of his rights cannot be the 'known or obvious consequence' disregarded by the City of Euclid through its training program and the *Monell* claim fails.") Because it was not clearly established that police officers responding to a medical emergency call could not apply pressure to the legs and lower back/hip area of a combative, non-compliant person

---

[10] The May 2, 2013 Columbus Police Legal Advisor's Update section entitled, "Federal Court Decision Dealing with Positional Asphyxia," provides critical points of the *Martin* case regarding the creation of asphyxiating conditions and the use of severe force. (ECF No. 34-9 at 737.)

in order to facilitate emergency medical treatment, the City of Columbus "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) (cleaned up) (emphasis in original).

Plaintiff also claims that the City of Columbus ratified the officers' conduct by failing to discipline them. (ECF No. 34 at 658.) The Columbus Division of Police conducted an internal investigation and determined that the officers did not violate department policy through their use of force. (ECF No. 36-3.) But as this Court has previously found, "[s]tanding alone, the internal review board's finding does not provide an adequate basis for imposing municipal liability . . . [as] *after-the-fact approval* of an officer's conduct cannot logically be the *moving force* behind the constitutional violation." *Sherrod v. Williams,* No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915, at *70–71 (S.D. Ohio Jan. 15, 2019) (emphasis in original) (citing *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (determining that an "after-the-fact approval of the investigation, which did not itself cause or continue a harm . . . [is] insufficient to establish [a] *Monell* claim."))

There must be a history of similar incidents, where ratification of these incidents establishes acquiescence and constitutes a "moving force." *Sherrod,* 2019 U.S. Dist. LEXIS 8915 at *71*; see Maynard v. Jackson Cty. Ohio*, 706 F. Supp. 2d 817, 828 (S.D. Ohio 2010) (finding that failure to discipline conduct on a single occasion "cannot logically be the moving force behind the alleged constitutional violation") (cleaned up); *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 n.5 (6th Cir. 2006) (examining an acquiescence claim concerning ratification of unconstitutional conduct and determining that "[w]e have not found any legal support for the proposition that, in the absence of deliberate indifference before a constitutional violation, a municipality may be liable for simply failing to investigate or punish a wrongdoer *after* the

violation") (emphasis in original). Here, even "Plaintiff recognizes that the lack of discipline in a single case . . . does not demonstrate an extensive pattern of the City tolerating deviations from its policy against using pressure on prone, handcuffed suspects." (ECF No. 34 at 658.)

Plaintiff has therefore also failed to make a sufficient showing to sustain a claim of municipal liability against the City of Columbus based on ratification. Accordingly, Defendant City of Columbus is further entitled to judgment as a matter of law on Plaintiff's claims against it.

### F. Plaintiff's State-Law Claims

Plaintiff also brings several state-law claims against the Defendant Officers for wrongful death in violation of Ohio Rev. Code § 2125.02, gross negligence, and loss of consortium. These claims rise and fall with the Court's assessment of the reasonableness of the officers' conduct, and the Court has determined that no constitutional violation occurred nor was the alleged right clearly established. "When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense through the lens of federal qualified immunity analysis." *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper v. Plummer,* 887 F.3d 744, 759 (6th Cir. 2018)).

Ohio Revised Code § 2744.03(A)(6)(a)–(c) provides police officers immunity from civil suit unless their "acts or omissions were manifestly outside the scope of their employment or official responsibilities;" their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;" or "civil liability is expressly imposed by a section of the Revised Code."

As the Court found that the officers' conduct was objectively reasonable under the circumstances, the Court also finds that their actions were not outside of the scope of their

employment, were not with malicious purpose, not in bad faith, and not in a wanton or reckless manner, and that they are entitled to statutory immunity on Plaintiff's state law claims. *Burdine v. Sandusky Cty.,* 524 F. App'x 164, 171 (6th Cir. 2013) ("[B]ecause the officers in this case acted reasonably under the Fourth Amendment, they are entitled to statutory immunity under Ohio law because they did not act outside the scope of their employment, with malicious purpose, in bad faith, or in a wanton or reckless manner.")

The Court therefore grants the Defendant Officers summary judgment on Plaintiff's state-law claims.

## IV.     CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 31) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: June 25, 2021